No. 82,952

In the Matter of DAVID M. DRUTEN, *Respondent*.

(982 P.2d 978)

Opinion filed July 9, 1999.

*Stanton A. Hazlett,* disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*William P. Coates, Jr.,* of Holman, Hansen & Colville, P.C., of Prairie Village, argued the cause for respondent, and *David M. Druten,* respondent, argued the cause pro se.

*Per Curiam:* This is an original uncontested proceeding in discipline filed by the office of the Disciplinary Administrator against Respondent David M. Druten, an attorney admitted to the practice of law in the state of Kansas.

The facts are not disputed. Druten did not file exceptions to the hearing panel's report. Under Rule 212(c) and (d) (1998 Kan. Ct. R. Annot. 236), the report is deemed admitted.

The complaint against Druten charges him with violations of the Kansas Rules of Professional Conduct (KRPC) 1.1 (competent representation) (1998 Kan. Ct. R. Annot. 279), 1.3 (diligence) (1998 Kan. Ct. R. Annot. 288), 1.4 (communication) (1998 Kan. Ct. R. Annot. 296), 3.2 (expediting litigation) (1998 Kan. Ct. R. Annot. 351), and 8.4(c) (engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation) (1998 Kan. Ct. R. Annot. 386).

The panel was divided. One member authored a separate minority report. We adopt the hearing panel report, amended by the minority report on the issues of mitigation and discipline.

The following facts were admitted by Druten in his answer to the complaint or were found by the panel to be proved by clear and convincing evidence:

"3. This matter concerns the Respondent's representation of William Samuels, who had been the Respondent's high school basketball coach and teacher. Respondent had maintained a social relationship with Mr. Samuels since his high school days. Mr. Samuels ran a carpet installation business in the Kansas City area in the 1980's. Respondent had represented Mr. Samuels in a collection matter in

1985, which was concluded by Respondent successfully collecting a $14,000 judgment.

"4. In the late 1980's, Mr. Samuels sold his carpet business but retained some accounts receivable. In 1991 or 1992, Mr. Samuels brought approximately 15 collection files to Respondent, all of which arose out of Mr. Samuels' carpet installation business. They were in the aggregate amount of approximately $105,000. The Respondent agreed to represent Mr. Samuels in these collection matters. Evaluation of the files showed that a number of them appeared to be uncollectible because the prospective defendants were in bankruptcy, had disappeared and could not be located or were obviously judgment proof. Approximately 8 to 10 of the files were identified as being possibly worthy of pursuit, although Respondent was concerned that the statute of limitations might apply and be a bar to some of these accounts.

"5. Periodically, from 1992 through 1997, Mr. Samuels contacted Respondent for an update on the cases. Respondent determined that there were substantial disputes regarding some of the files and these disputes involved disagreement with the facts stated to Respondent by Mr. Samuels.

"6. During the same time period, Respondent continued to represent Mr. Samuels, at his request, in other matters, including a DUI arrest, defense of a civil suit, and representation in an insurance dispute. During the course of these other representations, Respondent learned of several instances in which Mr. Samuels was untruthful or misrepresented facts.

"7. When Mr. Samuels was told of the potential statute of limitations problems which were apparent in some of the collections files, Mr. Samuels told Respondent that he would testify that the defendants had agreed to pay when it was obvious that no such agreement had been made.

"8. As to some files, Respondent prepared proposed petitions for review by Mr. Samuels; however, no cases were filed.

"9. Nevertheless, by letter dated March 3, 1994, Respondent informed Mr. Samuels that he had received scheduling for 3 of the collections cases, Hayes, Drew and Michael's Construction. He stated that Hayes was the 6th case on a 10 case docket set in Jackson County for the week of March 28, that Drew was the 5th case on a 6 case docket in Johnson County for the week of April 4, and that Michael's Construction was the 3rd case on a 4 case docket in Wyandotte County on April 16, 1994.

"10. On April 20, 1994, Respondent again sent a letter to Mr. Samuels stating 'notifications we have are the docket will be reached for trial in April or May. There are several cases on the trial schedule, but the cases in front of them will definitely be tried.'

"11. By letter dated November 6, 1997, Respondent misrepresented to his client the status of the cases, falsely indicating that some of the cases had been filed and were scheduled for settlement conferences.

"12. In January, 1998, Mr. Samuels became dissatisfied with Respondent's representation regarding the collection matters. The files were returned, and Mr. Samuels retained new counsel.

"13. Mr. Samuels made a demand for damages caused by Respondent's alleged professional malpractice in his representation of Mr. Samuels upon the Respondent's law firm. Through the firm's professional liability carrier, settlement was reached, and Mr. Samuels was compensated in an amount of approximately $100,000. The panel finds that the settlement was significantly in excess of the true value of the cases which Respondent had been hired to collect.

"14. Respondent self-reported the violation in late February or early March, 1998. In a written statement to the Office of the Disciplinary Administrator dated March 6, 1998, Respondent admitted that he made 'misrepresentations to Mr. Samuels' which were 'untrue and improper' and was 'therefore reporting myself for these violations.'

"15. Respondent admitted in his Answer and in the proceedings before the panel that he had violated [Kansas] Rule 1.3 (diligence), [Kansas] Rule 1.4 (communication), [Kansas] Rule 3.2 (expediting litigation, and [Kansas] Rule 8.4(c) (engaged in conduct involving dishonesty, fraud, deceit or misrepresentation)."

Mitigating factors noted by the panel included: (1) no prior disciplinary record; (2) engaging in a good faith effort to rectify the consequences of his misconduct including procuring a substantial malpractice award for Mr. Samuels and compensating his law firm for increased malpractice premiums; (3) self-reporting his misconduct and fully cooperating with the disciplinary administrator; (4) support for his character from judges and lawyers; (5) a substantial self-imposed sanction by Druten by ceasing to practice law until the disciplinary proceedings concluded; and (6) remorse. A majority of the panel also found an absence of dishonest or selfish motive.

In support of these mitigating factors, the panel made special findings of fact. It found by clear and convincing evidence:

"1. When the demand letter from Mr. Samuels' new attorney, was received, Respondent immediately talked to the Board of Directors at his law firm. He called the Office of the Disciplinary Administrator the next morning and arranged to visit with the office that afternoon or the next day. Respondent withdrew as a shareholder from the law firm, and waived certain compensation to which he was entitled to provide the firm with the deductible amounts under its malpractice coverage. Since early 1998, Respondent has not engaged in the private practice of law, although he has done *pro bono* work for various charitable organizations.

"2. Respondent has cooperated with the Office of the Disciplinary Administrator and the investigator appointed by the local bar association.

"3. After evaluating the collection files, Respondent shared his evaluations with Mr. Samuels. His response was that he would accept nothing less than 100% on the dollar, including interest, from each of the people. He told Respondent that

they were all deadbeats and he wanted to sue them for the full amount and 'whatever else we can get from them.' Mr. Samuels indicated that he would testify as to whatever was necessary to collect money from these deadbeats. Respondent was shocked and very uncomfortable. Up until this time, Respondent had believed that his client was honest in his dealings and had a high regard for him as coach and friend. As the representation continued, the client became stronger and more belligerent.

"4. Respondent testified that the misrepresentations he made to Mr. Samuels were related to his failure to directly address the conflict between his personal relationship with his client and his client's stated intent to lie about the claims. While representing Mr. Samuels Respondent knew that if he was concerned about Mr. Samuels' committing perjury in support of his claims, the proper thing for him to have done would have been to withdraw from his representation of Mr. Samuels.

"5. When asked by his counsel as to whether he had difficulty understanding the consequences of what he did, Respondent testified as follows:
'You know, I think in our initial conversation, in my conversation with my attorney and other people, 'Well, what did you think would happen eventually?' I don't think that—I kind of hoped that some of these people would voluntarily pay or that it would go away. I look on it as a mental lockup or freeze-up, whatever it is. I knew that some of these questions where he wanted to go after questionable files or questionable testimony, I wasn't going to pursue them. But I knew I wasn't going to turn him away either or call him a liar to his face. No, I don't know that I essentially considered the consequences at that time or what would happen.'

"When asked whether he had thought that he might end up before the Disciplinary Administrator, Respondent stated, 'I did not. Had I thought through that at the time, I probably would have had more motivation to tell him to go elsewhere.'

"When testifying, Respondent understood that he wrote the letters because of his relationship over the years with Mr. Samuels.

"6. Dr. Patrick Caffrey, a clinical psychologist, evaluated the Respondent. He determined that Respondent has difficulties with insight and understanding how certain consequences might unfold for certain behavior. The Respondent's long-term relationship with his client set the stage, creating a conflict between wanting to do the right thing and not wanting to damage the friendship. A small transgression, which the Respondent believed he could correct, got away from him and escalated. Mr. Druten reacted to a request by the client to do something he thought was morally wrong in a passive way. The psychologist testified that he believed that the events were isolated and that he did not expect the Respondent to do anything like this again.

"7. The psychologist testified that similar wrongdoing would not occur again because Respondent was truly sorry and had experienced much pain over the events. He is now confident that Respondent can make right decisions. The conflict that arose which caused Respondent to misrepresent the status of the cases

would not arise with clients who are not friends. If he had clients who are friends, the psychologist testified that Respondent now has sufficient insight to prevent a recurrence.

"8. United States Magistrate Gerald Rushfelt and District Court Judge Daniel Duncan both testified as to the Respondent's integrity, honesty and competence. Both testified that they would not expect the situation to occur in the future. In addition, Respondent submitted to the panel letters from 2 additional judges and 25 attorneys, each of whom informed the panel of their high opinion of Respondent's moral character and professional competence.

"9. In other situations with other clients, Respondent has recognized problems when clients have proposed suborning perjury or hiding documents and has been able to forthrightly deal with the issue. In this situation, Respondent was acting more as a friend than as a lawyer, and for that reason couldn't, 'pull the trigger.'

"10. Respondent testified that a similar violation would not occur in the future. The panel finds his testimony convincing."

The panel also discussed aggravating factors. It first noted the presence of a pattern of misconduct, "as Respondent repeatedly misled his client," but only with respect to Mr. Samuels' collection matters. The panel gave little weight to this aggravating factor. Respondent's substantial experience was also noted as an aggravating factor; however, the panel noted his expertise was not in collection matters, but insurance defense.

The panel found the KRPC 8.4 (misconduct) violation the most serious. It looked to The Standards for Imposing Lawyer Sanctions, American Bar Center for Professional Responsibility § 4.6, Lack of Candor (1991), as a starting point for determining the appropriate sanction. Quoting § 4.62, the panel observed "suspension is generally appropriate when a lawyer knowingly deceives a client and causes injury or potential injury to a client." The panel found respondent's conduct "fit[] squarely within this standard such that, absent other factors, suspension would be appropriate." However, because of the unique circumstances of the violations and the extensive mitigating factors, the panel majority recommended the sanction of informal admonition.

The minority panel member concurred with the majority's conclusions of law and findings of fact relating to the alleged violations. The minority report disagreed with the majority's recommendation of discipline. That Druten repeatedly misled his client over a period of 5 years was significant. Moreover, that Druten limited his

deceit to one client "does not belie the undisputed facts that over the approximate five (5) years in question the Respondent repeatedly engaged in conduct toward his client involving not only dishonesty, fraud, deceit and misrepresentation . . . but likewise, during the same period of time demonstrated a lack of diligence and promptness in representing his client's cause . . . ."

The minority report also disagreed with the majority's conclusion that Druten's conduct did not involve a dishonest or selfish motive. The report said:

"[T]he only motive I can attribute to the Respondent's conduct in question is the Respondent's conscious choice to subordinate his professional obligations for personal reasons, i.e. conducted himself in a dishonest manner towards his client for the selfish reasons of attempting to preserve a personal relationship. I consider this conduct to be an aggravating factor."

The minority report recommended published censure. However, the report noted that, absent Druten's self-imposed suspension from the practice of law, the recommendation would be indefinite suspension.

The Disciplinary Administrator recommended published censure before the hearing panel. We were informed at oral argument that upon repeated requests from Druten and his counsel for reconsideration and upon considerable deliberation, the Disciplinary Administrator altered his recommendation. He now asks that Druten receive the discipline of unpublished censure.

We hold that the findings of fact and conclusions of law of the hearing panel concerning the violations are supported by clear and convincing evidence. However, after a careful review of the record, and serious consideration of the mitigating factors, we agree with the minority report.

Druten's behavior *after* his misconduct is a testament to his character, but does not nullify his misconduct. He has admitted engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation over a period of approximately 5 years. See KRPC 8.4(c).

IT IS THEREFORE ORDERED that Respondent David M. Druten be disciplined by published censure.

IT IS FURTHER ORDERED that this order shall be published in the official Kansas Reports and that the costs herein be assessed to the Respondent.